Ms. Dobren, you may begin. Thank you, your honor. May it please the court, my name is Vicky Dobren and I represent petitioner Mr. Yang. I'd like to reserve 4 minutes for rebuttal. In Wren v. Holder, the court outlined the steps that an immigration judge must take when she determines that an asylum seeker's otherwise credible testimony doesn't meet his burden and that he must corroborate aspects of his testimony. The first is that she has to identify what parts of the testimony he needs to corroborate. Then she has to determine what evidence he should provide to corroborate that testimony. Then she has to determine if he doesn't submit the evidence, whether it was reasonably available. And then finally, regardless of whether he submits the evidence or not, she still has to determine whether he meets his burden with the evidence he did submit. And it's that final point. In this case, your challenges are what I guess I would call in your opening steps 3 and 4? Or just 4? We're challenging all steps, your honor. That's why I was interested in your opening. It seems to me the I.J. in this case was very specific about what she wanted to see. I'd like to see documents that relate to the following. And it was clear why she wanted them. So I'm not sure that I see any failings at steps 1 or 2. If there were some, would you identify them for us? Well, sure. In step, I mean, and may not have been entirely exhausted. So and I obviously I didn't represent Mr. Yeah. But as to the first steps, it's true. She issued this very lengthy corroboration order, but she largely failed to specify what exactly was, you know, she wanted corroborated with the testimony. For instance, as to evidence from his former criminal attorney. She didn't indicate what exactly. What exactly in this Tony she wanted the former criminal attorney to address. It's very open ended. I'm not sure how persuasive that is just based on the order. But was there any did the petitioner go back to the I.J. and say, I'm confused about what you're asking. I need more direction. No, he didn't do that because this was all done after a hearing, which was also unusual because filed anything that said, your honor. Thanks for the order. We'd like more specificity. So I guess I'm back. No, the reason and I don't want to take you too far afield, but it's the way you open. I don't think these first two, if they are separate arguments were exhausted as I read the briefing below in here. It's about whether or not the I.J. reasonably concluded that there was information that he should have produced that he didn't. And whether she reasonably concluded on the basis of the information that she had, that he shouldn't get the relief he sought. Isn't that the issue? Aren't those the issues you briefed? It is. So why didn't you? But yes, yes. And I and I do. I would like to just kind of move beyond these aspects of where I'm just because I agree that they're not necessarily before the court and that the real issues are later in the analysis, which is whether the immigration judge was wrong and not accepting that some of that evidence was not reasonably available. I mean, he outlined the many steps he took to get that evidence. And she didn't give that is asking. She didn't give enough weight to his explanations. And then finally, she didn't consider what he did actually submit. And this is why there was a dissent from the board, which is unusual and which I would like to focus on primarily. I believe it gives a very good roadmap to follow. The dissent pointed out largely in line with kind of final analysis in Wren that the immigration judge didn't consider relevant and potentially positive evidence in analyzing the case. So in Wren. Seems like the immigration, the dissent. I agree with you. It's rare. The dissent in the BIA seem most focused on the fact that there was an apparent misstatement in the IJ's decision. And then it seemed to use that bootstrap that, if you will, as an entry point for other other possible problems with the IJ's analysis. But to what extent did the possible misstatement by the IJ actually affect the IJ's analysis? Because the BIA majority in that footnote, I read them to be basically saying it really didn't affect the analysis. I believe it did affect the analysis. It might not be the strongest point that the dissent brought up as to why the case should have been remanded. But I'll address it. So this case turns on what happened August 2017. And Mr. Yang consistently testified and presented corroboration that he sent his employees to repair his pipeline. And so for the immigration judge to say that he testified that he sent employees to stop a competitor from repairing his pipeline. It misconstrued what the testimony was. And there's evidence in the record that she didn't even consider. But the press, I think, asked you probably to assume that that finding that the IJ made was incorrect in light of the evidence produced in light of the testimony. And that the correct conclusion on the record would have been that he sent his employees down there to safeguard his own property and make sure it was OK. The question that I don't think you've answered yet is, let's assume that's your only argument. Does that require us to grant the petition? Or in the larger scheme of things, is that argument something that the BIA, as the BIA said, didn't affect the final decision? Well, if it were our only argument, it might not be enough, but it's not. But let's say it is. That goes to the part of whether the red notice is valid. Because the red notice says he sent employees there and damaged a locomotive machine and caused public disorder. So if she mistakes his testimony on what he sent his employees to do, that goes to the very heart whether he's being persecuted or prosecuted. Because then it would indicate that the red notice is a sham. And so it is relevant. I think I might agree with you if the IJs had placed a lot of weight on this possible misinterpretation of his declaration. But she didn't really. You know, she mentions this and she has a whole other portion of her analysis. Sometimes we see IJ decisions where an IJ says this is absolutely essential. And that tells us that the IJ thought something was essential. But I'm not sure we have that here. I mean, it's probably in and of itself not the strongest reason that the dissent pointed out as to why remand was appropriate. Okay, so yeah, I think that's a fair statement. So what do you think are the strongest reasons? Well, the expert testimony first. I mean, that was significant and it was not considered. Of course, the government argues that she considered it just because she summarized it in the beginning of her decision. But just summarizing the testimony is of no consequence if she doesn't actually apply it to the analysis later in the case. And she doesn't do that. What could the expert offer? I mean, the expert offered, you know, country conditions type, atmospheric type analysis of what the Chinese government does in a general way. But what could the expert offer that's actually material to this difficulty in this case, which is whose side is more plausible? Well, he explained that the charge of picking quarrels and causing troubles is kind of a no – it's sort of this, you know, pretext when China wants to go after opponents of the regime. And so that testimony is extremely relevant here because that is the allegation. It's that Mr. Yang – that's what China is saying he did. And so that testimony goes to, like, the very heart of whether this is a legitimate prosecution or persecution. And so – and there's other country conditions evidence that supports that testimony. Let me see if I can rephrase your argument, and I want to understand it. What you're saying is that the IJ was wrong in her conclusions about what Mr. Yang was doing when he sent his employees down to look at the pipeline and that the red notice, if you will, was premised on those kinds of allegations. So neither of those tip the IJ – should be able to tip the IJ towards one of the two plausible versions of the story. What other evidence was there to support the side of the story that the IJ adopted? In other words, the IJ said either he's an honest businessman being persecuted or he's a corrupt businessman. And so as to the second one, take out for a moment the evidence about sending the people to the pipeline, take out for a moment the notice. What other evidence is there to support the second story? Well, we don't believe there's really any other evidence in the record that the immigration agency could identify. I mean, she relied significantly on the 2016 – and so did the board – to say that, you know, if he was a, quote, corrupt actor as to 2016, that sometimes he's a corrupt actor as to 2017. And that – those two things don't go together. Except let me – I'm sorry. There is a conviction in a Chinese court in an appellate decision that describes what he's doing. It gets remanded because he's cooperating. But there does seem to be a factual finding that he's offered bribes to officials by a Chinese court. How much weight that should be given, I'm not sure. But there is some other evidence in the record of corruption, isn't there? Well, it depends. I mean, we don't read the documents the same way. You're breaking up, so let's stop the clock for a second and hope that the – Am I back? You are. And Judge Thomas had a question. Oh, I – Well, I mean – I just got – So my question, then, I suppose, is what your client meant when he stated to the BIA that it's a straightforward case with two potential realities. I mean, if you're telling us here that there's no evidence supporting the other reality, I guess I don't understand that – what that statement was supposed to mean. And it's a good question. And, you know, again, I didn't represent – I didn't have the opportunity to represent him before the agency and in briefing to this court. And so, you know, I don't believe he should have conceded that at the board, but that's where we are. But regardless, even assuming that there are, quote, two potential realities, the immigration judge still failed to consider the evidence that he provided, significant evidence he provided that supported his version of the story. Okay. So, yeah, walk us through. What is the evidence? Okay. So the expert, the immigration judge credited his testimony that he was tortured in 2016. So she essentially found that he was tortured, but that – she said that that didn't show that the entire case against him was illegitimate. And that kind of is – that conflicts with this court's jurisprudence, because it's never the case that torturing a criminal suspect constitutes a legitimate prosecution. That would suggest that this was persecution. So that's another point. And then there's just an extensive amount of evidence that he did provide. I mean, he provided over 500 pages of evidence, much of which corroborated his version of the events. So – and I could kind of go through all of it. I know that a lot of this was outlined. Well, yeah, let's be a little specific. I mean, what do you think in that 500 pages most compellingly shows that his version of what happened here is the right one? Okay. So he included these tip-off letters his CEO wrote to the local government about Zhu Hu, and those are at AR 674. Those individuals were also the people that he complained about. So he outlined everything that happened. And then those individuals were arrested and prosecuted. So that's in the record. There's statements from – he has a statement from his – one of his employees that explains what happened that day. That's – I can tell you where that is in the record in a moment. I'll get back to you. Is that a half-page statement? Yeah, but it's not – it's not – it's got some detail in it. Then he has a list of all of his employees that were arrested and, you know, a lot of detail about it. He submitted – That's a list he made. That's a list of employees arrested. No, it was his – he didn't make the list. His employee – that was from the company records. He got those records from his company. And that's at 335 of the administrative record. He submitted evidence that the Chinese government took over his company. That's at AR 343. The declaration from the employee is at 355. His nephew submitted a declaration. It's pretty detailed at 284. His sister-in-law submitted a detailed letter at 276. He submitted a lot of documentation about his business contracts with the Hulan District, which support his version of the events. I mean, he had the exclusive right to provide heating in the district, and the government agreed it would not allow any other entity to build a pipeline.  And so it would make no sense that he would then be going to damage someone else's pipeline when it was his pipeline. And this is something that he explained extensively at the board and in his briefing to the court. Let's see. There was a police clearance certificate that he provided that indicated that he had no criminal – post-dates, the 2016 case, and August 2017. So that's another document the judge did, but that's in the record. Can I ask you a question, Judge Hurwitz, if you'll permit me? There's at least two points in the BIA decision where the BIA says that the petitioner hasn't challenged something before the BIA, you know, once where he says about the steps he took to locate information about his 2016 bribery issues, and the BIA says he doesn't challenge that finding on appeal, that he didn't take reasonable steps. And then later the BIA says that the IJ found that he hadn't demonstrated that certain evidence was not reasonably available and he hasn't challenged that, and they consider the issue waived. Are those findings accurate? How do we deal with those in light of what you're saying? It's a good question. And, I mean, our position is that although it probably wasn't raised to the level that it should have been, he did sufficiently put the issue out there. I mean, he argued that he tried to corroborate his notice of appeal. He said that the immigration judge should have considered his circumstances, determining whether he could get some of the evidence that she was requesting, particularly because China is, you know, seeks to arrest him. And so a lot of the evidence that he couldn't get, some of the evidence is evidence that is coming from state-owned or state-run entities, the Bank of China, for instance, the courts. And so he did mention, he raised it in his notice of appeal, and then he did argue it at the board in his brief. He argued that, you know, certain things weren't reasonably available. He may not have gone through all of the reasons that Mr. Yang and his son gave to the IJ, but he did raise the issue sufficiently. Right, I mean, I guess I'm just a little concerned that the BIA did not have before it the helpful arguments that you've been making here, and nor am I confident we had before us the arguments you're making here in the briefing, which you didn't, you weren't responsible for, which I guess leads me to my second question, that I saw you had filed something indicating your client's pursuing a motion to reopen. Is that still in progress? It is, Your Honor. We filed that about a month ago and feel very confident that that is going, I mean, obviously, you know, our position is a very strong motion. It's based primarily on conditions in China. His wife has been tortured and she's still in prison. She's been tortured. She's been denied access to counsel. We have this documented in the motion, and his minor son has been threatened by Chinese. Come to the home. They drew blood from him. There's evidence of changed conditions, but then also argued that he was ineffectively represented. Okay, I was going to ask you about that. And have you followed the procedures in the matter of Lizada for making that claim? We have. I mean, he's been, he resigned from the practice of law in November 2021 with disciplinary, in lieu of disciplinary proceedings. And in the materials, he was required to resign from, he's, I think, admitted in other jurisdictions as well, he was required to resign from all jurisdictions. And so under Lizada, we can't really complain to a state bar because he's no longer a member of a state bar, but we did otherwise follow all of the Lizada steps in our motion to reopen. Do you have any sense of the timing of this process? I know sometimes this can take a while. I believe it could take quite a while, in part because Mr. Yang was finally released from custody last month. Say that again, you cut out. Oh, I'm sorry. I think it could be a while. It could be anywhere from six months to a year, a year and a half. I mean, we believe. We're all interested in what you got cut off saying. You said particularly because Mr. Yang and then the rest of it got cut off. All we heard was last month. What happened last month? I'm sorry. I'm sorry about that. He was released on bond last month, having been detained for almost three years, which is, in our view, also why some of this evidence the judge requested. I mean, she held him to a standard that is really unheard of in an immigration case. I've been practicing over 20 years, and his corroboration was extensive, and his efforts to get the documents was extensive. We've taken it over, and now you're going back to your argument, which I don't blame you for. We'll give you some time for rebuttal after we hear from the government. Counsel, maybe you could begin by addressing Judge Bress's last question. What's the status of the motion to reopen, and what's the government's position on the motion to reopen? Your Honor, she didn't send me the motion for review. However, I generally agree with her assessment that, in cases where the petitioner is not detained, it will probably be upwards of a year or more. It just depends. You may not be the lawyer in charge of it, but you're the only lawyer from the government we have here today I can ask. What's the government's position on the motion to reopen? Again, I haven't seen the motion, so I don't know what legal or if she's attaching new evidence. I think she said ineffective assistance of counsel. But, I mean, just if Your Honors want to know, I thought the briefing in this case was not particularly. Nothing struck me as being ineffective just by the briefs. But, again, if she's raising new arguments. I mean, not pursuing the withholding or CAT claim? I mean, I didn't say they were successful. Unusual? From my experience, not unusual. But, again, right. I'm putting you on the spot on something you have no responsibility for. I guess what I was trying to ask in a backwards way is whether the government would want us to hold on to this case until we find out what happens to the motion to reopen. It would seem to, if it does get reopened, we'll have spent a lot of time and effort on a case that we'll start all over again. I know what counsel's position on that would be. On the other side, I'm wondering what your position is. I think we would like the decision to proceed just because the motion to reopen, it's going to bring up completely separate issues. But, again, it's really the courts. I think the final call rests with the court. But, again, I couldn't speak on the arguments in that motion. Those are not issues that were briefed. But they came up, and I think, like Judge Brass, I looked at the underlying representation in this case and thought that it was not ridiculous to think that someone might think it was ineffective. But let's go on to the merits of this one. Sure, Your Honor. I would just like to respond to a few of the points brought up by the petitioner. I want to start with the claim that the I.J. aired in finding that Yang directed employees to stop the construction. So what evidence supports that conclusion? Sure. There's a few, two pages really that specifically address it. First is on page 340 of the record. If I could read just two sentences. On August 30, 2017, Zinma, without receiving any notice, found an unknown construction team digging the road surface and constructing a four pipeline. What are you reading from, the notice, the red notice? No. This is from a company document. This was in the corroboration filing that petitioner submitted responding to the I.J.'s corroboration order. Give us the AR number again, if you would. 340. And then it goes on to say, to help safeguard the safety of the heat supply system and protect the governmental assets from being damaged, as well as to fulfill the responsibilities of repair and maintenance, employees of Zinma obstructed the construction at the construction site. So that's one page. Is this something the I.J. or BIA identified in its decisions? I believe the I.J. cited to the exhibit. It would be exhibit. Yes, I believe it is in the I.J.'s decision, but I can give you a page number. What was the I.J.'s actual finding, though? Didn't the I.J. make an actual finding that the company destroyed existing pipeline? So the I.J. found that the employees were sent to stop the construction of the rival pipeline, which resulted in property damage to the rival companies. Tell me how this document that you cited shows that they did what the I.J. said they did. Because the petitioner was claiming that they were protecting their own pipeline from being destroyed. However, just to back up a little bit, the petitioner testified that this whole dispute arose out of a contractual dispute where the third-party company was trying to connect its pipelines to Yang's pipelines. So that was the whole context of this dispute. So it really makes sense that I think that's what the I.J. was looking at and citing to, was these documents showing that there was this ongoing contractual dispute between these two parties. Something happened at that site. He says they destroyed his pipeline. They say that the other side was in the wrong. However, that was the whole point of the corroboration order, was to kind of get more information about what had happened. This document at 340 is something that Yang presented to them? Correct. Did the I.J. actually find that this happened or just find that this was supported and that there was no basis to conclude that it was necessarily wrong? Because I don't necessarily know that the I.J. found anything. It just found that there were two potential realities here, and we just don't know which one is the right one, but there's enough reason to question Yang about his account, so let's get some more information, and Yang has not provided that information. Right, Your Honor. Yes, that would be correct. Because this is a corroboration decision. It's not saying that the petitioner was guilty of what is alleged in the Interpol red notice. The point of the corroboration was to get more information, and that's why the agency ultimately found that he failed to provide reasonably available evidence. So, right, it's not that there was a sort of the agency was finding that this charge was correct. It just raised questions that led to the corroboration order, and when he didn't provide the evidence or reasonably explain why he didn't provide it, that was the independent basis for denial, which is the subject of Wren v. Holder. Let's focus for a second on the evidence he did produce. He did produce a declaration that says, I hereby testify the manager said, and we were sent to restore the pipelines. That's, I'll get the name wrong. It's Kong's declaration. Why isn't that corroborative evidence of his story? So that declaration that the IJ found was insufficient because, first of all, it was undetailed. The IJ had asked for multiple declarations, and this declaration was, and I would point out that this declaration was inconsistent with Yang's testimony. For example, Yang testified that 40 people were detained, 13 were, 40 people were arrested, 13 were detained, whereas the declaration said that 47 employees were detained from 5 to 15 days. So there was some inconsistencies. There's also other evidence he submitted saying that 32 people were detained on page 353 of the record. So this, it didn't really clear up what happened. And also, it didn't really describe the events with any detail, which I think the IJ basically said that he didn't show that what happened, the way they were treated was without due process because, again, these people were. And we may have taken you off track here because Judge Bress asked, and I'm interested if there's more, what evidence is there in the record? Maybe I asked, but Judge Bress followed up on it. What evidence is there in the record that Yang sent people down to do dirty deeds, if you will, with respect to the pipeline? You pointed to AR-342. Is there something else? Yeah. It says AR-340, AR-1009 was a report by Pengfei describing similarly that they discovered that the other company was building pipelines and they sent employees to stop it. However, I do want to go back to Your Honor's point that this isn't really material to the outcome of this case because, again, first the IJ was, this is a corroboration case. It doesn't really come down to whether this, even assuming the IJ erred, the board determined on AR-704 that any error was harmless because it didn't change the fact that there were two contrasting. I agree. That's why I was trying to figure out what the facts support. Yeah. The version that the IJ adopted were. Right. And you pointed to 340 and 1009? 1009. 1009. What else? So 216 to 218 was Yang's testimony about kind of the background of the dispute, talking about how the other company was building these pipelines that they didn't like. So I think you can infer that kind of supports an inference. Obviously there's the Interpol notice itself on page 467, which I would like to note, I don't think the agency was kind of discounting the fact that China abuses Interpol red notices. I think the problem is that this Interpol red notice was very specific. It gave the time, date, what Petitioner was accused of doing. He didn't offer sufficient evidence to corroborate his version of the story. Just to pause you, I mean, there's two things going on here. One is, did he act diligently or was there some other evidence out there that was unavailable? That seemed to be the focus of things before. Now I think counsel has said, well, no, there actually was in the record. Forget about what he didn't get or couldn't get or didn't do a good enough job of getting. Now we have, there is evidence in the record that shows this. So then taking that, then isn't the ultimate question just does that evidence compel the conclusion that his account is correct? I think the issue here, because I think because he conceded before the agency that there were two plausible views of the record, step one of REN is not really an issue in this case. I think it's only step two, or I guess maybe what we're calling, I think step three, it's a little unclear. But step three is whether there was reasonably, whether he provided the explanations. So I think that's what is really on review here. Provided the explanations for what? For why he couldn't get more? For why he couldn't get the requested evidence. So just to kind of clarify, he submitted no documents regarding his 2016 bribery dispute. And his only explanation for any of the documents that he raised to the board was that his son contacted one publicly available phone number for the attorney in China. Didn't attempt any other methods. And this was very significant because his son admitted that he had access to all the company records until two months after he was detained, after the petitioner was detained. Yet there was no other documents. And although he kind of just conclusively stated before the board that his attorney was afraid to admit to help him, he never gave any evidence of contacting him. He never even alleged that he contacted his attorney. So I think the agency, the board, was really looking at that and saying, listen, we gave you the chance to provide this evidence or at least explain why you couldn't provide it. And they reasonably weren't satisfied. So I think the court would look to whether the record compels reversal of that decision. So whether essentially looking at if the record compels his explanations were reasonable. So your position on the pipeline dispute, if I can call it that, is that the IJ's findings are accurate. That's I would first say first. Yes, they're accurate. Find substantial are supported by substantial. They're supported by the evidence. And even if not, it's it would be harmless as the board determines. Right. So that's without that's considering whatever Mr. Yang produced in the corroboration stage. Right. Yes. Because as the agency found, there's two views. They did. They weren't saying he provided no evidence of his version. They just were saying that they needed in light of the two contrasting views of the evidence, most of which was actually his own company documents, which went against his claim. They wanted these this evidence as outlined in the corroboration order. Is the harmlessness question limited just to the IJ's possible misapprehension of Yang's testimony? Because that's how I read this issue to be. The dispute here. I think they were making that determination in regards to all the dissenting board members. Three points, as we point out in our brief. And again, our position is that two of them really are unfounded, especially with the allegation that he didn't have any arrest history. As we point out, that certificate that Petitioner's Counsel was talking about was actually from two months before the appellate court opinion. So it didn't shed any light as to what he was convicted of on remand. And you can see the date of that opinion on page 663 of the record. And that's compared to the certificate, which is on page 648. Can I take you back, and I want to make sure I have the right document, to AR1009? And tell me where that provides evidence or inference that Mr. Yang had sent people down to the pipeline to do dirty deeds. Yes, Your Honor. I say I'm over time, but let me. My record shows that as being page 3 of 6 of a report. Right. So it says, the buildings developed by Yu Wenbo's company were connected with the network for heat supply. It actually goes on to 1010. So there they're essentially talking about the dispute between Zinma and the third-party company, where the third-party company was building the pipelines, trying to connect them to. No, and everybody agrees there was some sort of dispute. The question is, what evidence is there that the employees that were sent down there did the thing that the IJ suggested they did? Yes, Your Honor. I think I'm trying to just skim this document very quickly. I couldn't find anything in this document that said so. It does corroborate that there's a dispute going on, which I think Mr. Yang also said was the case. But I don't see anything here that tells me that employees were sent down to disrupt anything. Right, Your Honor. I think I might have misspoke there. I think that was just in relation to the background of the dispute. But I think 340 by itself is enough because, again, the only thing corroborating his version of events is really that's his statement and, I guess, one other document. So either way, there's competing evidence, and I think that isn't sufficient to show the record compels otherwise. You've gone over. Let me see if my colleagues have further questions. Thank you, Your Honor. We thank the government for its argument. Let's put two minutes on the clock for appellant's counsel for rebuttal. Thank you, Your Honor. I think the court is pointing out an important point, and that is that there is no evidence record other than the red notice itself to establish that Mr. Redd noticed as he did. To the contrary, I mean, on the opposite side, there's evidence he didn't do that. There's his credible testimony, his declaration. There's also, as I mentioned before, these tip-off letters that he submitted, and that's at AR-760 to 769-70. And in there, he talks about what happened, and this is something he submitted to the court before the red notice was even provided to him. And I think that's significant because he hadn't even received the red notice or the allegations against him until shortly before his merits hearing. What about AR-340? AR-340? That document doesn't show anything. That supports what he says. It doesn't in any way indicate that he sent employees to do anything nefarious. Well, but it says that the employees obstructed the construction at the construction site. Well, even if that's obstructed the construction, it could just mean they're damaging his pipeline by doing this. And so I think part of it is this. Let's just read it. It says, on a certain date, Zinma Company, without receiving any notice, found an unknown construction team digging the road surface and constructing a four pipeline. And then it says what they did. They obstructed the construction at the construction site. Doesn't that support the notion that his – it may – I mean, I understand his position that I had the exclusive franchise and I was – nobody else was entitled to construct. But doesn't that support the conclusion that his employees were sent down there to obstruct the competitors' operations? It might, but that doesn't mean that he sent them there to damage the competitors' equipment. And beyond that, the agency didn't rely on this. And so the government cites to it a lot of evidence in the respondent's brief to kind of, you know, bolster the agency's finding. But under Chenery, the court can't look at evidence that the agency didn't rely on. Right, but the agency only didn't need to because the petitioner had conceded there were two possible realities here. And so it was all based on that starting point that this case then proceeded. And I think what you're arguing, and you make the argument well on your client's behalf, is that there really are not two possible realities. There is one reality. The problem is just that that is not how this case was presented as it came up through the agency. I understand that, Your Honor. And even assuming that there's two possible realities, I still believe that the immigration judge should have concluded that the evidence he didn't present was not reasonably available. I mean, he outlined in detail in his declaration and his son's declaration the steps he took to get the evidence. And he came up with a lot of the evidence. I mean, his son explained that he dropped out of the University of Washington. He had to drop out of college. And he had to dedicate full time helping his father obtain evidence. Right, but then I think this brings us back to the face of the BIA decision that says these particular arguments are waived. I mean, I guess our primary argument is they're not because he did raise the issue. But, you know, the court also has asked about the motion to reopen. And we do address many of these things in that motion. And we do think, given that this is a record of over 1,000 pages, that the court, you know, if it's not sure how it wants to resolve this case, that it would be, you know, a judicially appropriate use of resources to wait for the board to motion to reopen. Because, you know, there is significant new evidence that he provided in that motion. And it goes to the very heart of his case and establishes his version is the correct one. Alternatively, the arguments that his former attorney waived are now being made. And he will have an opportunity to make those arguments. And so, you know, we believe that, and the court's aware that Mr. Choi was not disbarred, but, you know, would have been disbarred. He resigned with discipline pending against him. And given those circumstances, it would be, you know, fair to Mr. Yang not to get the opportunity to present these arguments somewhere. And so if the court doesn't take them here because they've been waived, then we do believe we should get that chance so the court could put off ruling on Mr. Choi because he's not detained. So that issue is not of a concern that normally would be. Unless my colleagues have other questions, I would thank both sides for their argument and briefing in this matter. And this matter will be submitted, and we will stand adjourned. Thank you. All rise. This court for this session stands adjourned.
judges: HURWITZ, BRESS, THOMAS